UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CASE NO. 2:22-cr-19-2 |
| Plaintiff, | : | JUDGE GRAHAM |
| v. | : | |
| JONATHAN ALLEN FROST | : | **GOVERNMENT'S SENTENCING MEMORANDUM** |
| Defendant. | : | |

The United States of America, by and through its undersigned counsel, respectfully submits this memorandum for the sentencing of Jonathan Allen Frost ("Defendant" or "Frost"). For the reasons set forth herein, the United States recommends the Court impose a sentence of 100 months of imprisonment, followed by thirty years of supervised release, to include the conditions agreed upon by the parties in the Plea Agreement (Doc. #5), and order the forfeiture of the agreed upon property in this case. The recommended sentence falls within the properly calculated guideline range after consideration of all applicable departures and variances.

I.     **Factual Background**

This case is not simply about the destructive terroristic means devised to sow mayhem and division among Americans. Fundamentally, the actions of Frost and his coconspirators were inexorably linked with their singular end goal: the propagation and fruition of white supremacist ideology. From about October 2019 to March 2020, Frost—along with Christopher Brenner Cook ("Cook") and Jackson Matthew Sawall ("Sawall")—conspired and agreed to provide material support and resources in the form of training, weapons, explosives, and personnel, knowing and intending they were to be used in preparation for and in carrying out an attack on the United States power grid. This conspiracy to provide material support to terrorists was designed to create

1

confusion, unrest, and—in the coconspirators' estimation—a ripe opportunity for white leaders to take control of the country and the government. The coconspirators acknowledged that people would die if they achieved their goal of causing a widespread power outage. Frost played an essential role in this plan of destruction and division by handling the logistics. Namely, Frost researched and planned the best method of attack, obtained assault rifles, tested at least one homemade explosive device, and created suicide necklaces for his coconspirators.

Cook and Frost initially met in an online chat group where they discussed the idea of attacking the nation's power grid. In furtherance of this idea, Frost shared information about possible power grid targets. By late 2019, Cook had recruited his friend Sawall to join the cause. From the outset, Cook believed Sawall's graphic design skills could be an asset to the group's propaganda efforts. Cook and Sawall then worked to recruit others. As part of these efforts, Cook circulated a reading list that promoted white supremacy and Neo-Nazism ideology. Two of these books, entitled "Siege" and "A Squires Trial," encourage aggrandizing power through violence. Cook specifically sought out younger recruits (including juveniles) because he believed they were less likely to be law enforcement.

Communications between Frost and his coconspirators often occurred on encrypted apps and platforms for operational security; members of the chat groups, including Frost, also changed their screennames or monikers. The conspirators also had a separate propaganda group called "The Front." If the attacks went according to plan, "The Front" intended to claim responsibility for the attacks. Two more exclusive subgroups were created for those who passed additional screenings. Cook shared plans to attack the power grid with the first subgroup named "Lights Out." Specifically, Cook shared a link to a U.S. Department of Energy report that detailed information relating to the grid and the difficulties of timely replacing large transformers. The precise details

of the planned attack were only shared with a smaller subgroup called "Lights On," which consisted of Frost, Cook, Sawall, and a few others. In January 2020, Cook shared a YouTube link concerning an explosion with the "Lights On" group. Frost predicted that the explosion would be "a pretty good distraction," to which Cook responded, "That's what I was thinking; especially if you were to use a propane tank too." Frost then commented that "there was a real fireball and fire present for many minutes. THINK BIG…. [W]e can delay police response by an additional 5-10 minutes if our distraction plans succeed." Frost subsequently obtained the materials for building explosives and tested one such device at least once.

Initially, the group took on a cell structure: Frost was responsible for the attack in the Southwest, Cook was responsible for the attack in the Northeast, and Sawall was responsible for the attack in the Midwest. The planned attacks in the Southeast and Northwest were to be carried out by two other individuals. The logistics later changed, however, and one person would be responsible for attacking each substation. Defendants planned to attack substations with powerful rifles that would penetrate the transformers. Not only did they believe this would cost the government millions of dollars, but they envisioned the following electrical disruption would cause confusion and unrest. There was even discussion that their plan could succeed in producing a race war and the next Great Depression. The coconspirators' aim was to tear down the system to create an opportunity for white leaders to gain power.

Rather than a fleeting fascination, Frost and his coconspirators were deeply devoted to this conspiratorial cause. In fact, Cook and Sawall both expressed their commitment to die for their cause. After discussing the idea of suicide necklaces that could be ingested if they were caught by the authorities, Frost made suicide necklaces and filled them with fentanyl. In February 2020, Frost

provided the necklaces to Sawall and Cook. Soon thereafter, Sawall swallowed the capsule on his necklace during a traffic stop in Columbus, Ohio, though he ultimately survived.

Frost's, Cook's, and Sawall's commitment to their radical ideology turned from ideas to concrete actions in furtherance of the attacks. After researching the April 2013 attack on the Metcalf Transmission Substation near San Jose, Frost believed that a powerful caliber would be necessary to penetrate the transformers. With this information in mind, Frost obtained several AR-47 rifles. Frost purchased 80% receiver kits online—which do not carry serial numbers—and built the remainder of the rifles. In February 2020, Frost, Cook, and Sawall met in Columbus, Ohio. Perhaps understanding the criminal nature of the meeting, Frost displayed a fictitious Texas license plate on his vehicle throughout the visit. There, Frost sold Cook one of these untraceable AR-47s to perpetrate the attacks. Frost then trained Cook how to shoot the rifle at a shooting range. Sawall offered to fund the purchase of additional weapons.

This February 2020 meeting between Frost, Cook, and Sawall in Columbus also served as an opportunity for the group to detail logistics and propaganda for the planned attack. Sawall paid for the group's expenses during this trip. While in Columbus, Frost photographed Cook and Sawall posing with a swastika and the words "Join the Front," which they had spray-painted under a bridge. They also planned to hang propaganda, spray paint a mosque, and cut down a telephone pole to propagandize "The Front." However, a traffic stop disrupted these plans. A search of Sawall's vehicle revealed the AR-47, additional firearm magazines, a Nazi flag, spray paint, and white supremacist propaganda. Frost, who was wearing camouflage as well, provided law enforcement a false name during the traffic stop.



*Pictured left to right: Sawall and Cook; Photographed by Frost.*

Despite this encounter with law enforcement, the group continued to progress with recruitment and preparation for the attacks. Frost circulated a MEETUP GUIDE to the group with guidance for how to safely meet a recruit and noted less concern for a person under 18 because "[T]hey are 99% not a Fed…" reinforcing the idea that juvenile recruits were preferred. Cook made clear in the chat group that "[I]f anyone's scared, may as well pussy out now. Something needs to get fucking done and a lack of dedication moves us back 10 steps," to which Frost responded, "Amen, we need men with balls." In mid-March 2020, Frost and Cook traveled to Oklahoma and Texas, where they attempted to meet with additional recruits along the way (the recruits included juveniles). Once again, on March 15, 2020, while in Texas, Frost and Cook were stopped by law enforcement; a search of the vehicle revealed a Nazi flag, several military uniforms, burner phones, and fentanyl from the suicide necklaces.

In August 2020, law enforcement executed search warrants on Frost's, Cook's, and Sawall's residences, which revealed the extent to which the Defendants still clung to their desire

5

to cause economic turmoil and death in furtherance of their ideology. Specifically, agents found the following items in Frost's residence: multiple firearms, including an AR-15 pistol without a serial number, suppressors, milling tools, chemicals and components capable of building explosives, racially motivated violent extremism Nazi material, and information about U.S. power infrastructure and substations. Digital evidence from the search further revealed weapons modification manuals and explosives production manuals. In Cook's home, FBI agents found an unassembled rifle (not the one purchased from Frost), a copy of the book "Siege" in his bedroom on his nightstand, racially motivated violent extremism Nazi material, the cell phone used to communicate with his coconspirators, a tactical magazine, and camouflage clothing. The search of Sawall's home revealed information about "The Front," its recruitment tactics, and propaganda posters and photos. A message written on a memo pad in Sawall's home encapsulates the coconspirators' state of mind and a recurring theme in their communications: "Revolution is our solution."

  

## II. Procedural History

On February 7, 2022, the U.S. Attorney for the Southern District of Ohio filed a one-count Information charging Frost, Cook, and Sawall with Conspiracy to Provide Material Support to

Terrorists. On February 23, 2022, Frost pleaded guilty to Count 1 of the Information pursuant to a Rule 11(c)(1)(B) Plea Agreement and attached Statement of Facts.

### III. Sentencing Guidelines Calculation

a. <u>Statutory Maximum Sentence</u>

The maximum sentence for Conspiracy to Provide Material Support to Terrorists is 15-years imprisonment, a life-time term of supervised release pursuant to 18 U.S.C. §§ 2332(b)(g)(5) and 3583(j), a $250,000 fine, forfeiture, and a mandatory special assessment of $100.

b. <u>Sentencing Guidelines Calculation</u>

In imposing a sentence, the Court must consider the sentencing factors set forth in 18 U.S.C. § 3553(a). *United States v. Booker*, 543 U.S. 220, 261 (2005). First, as stated in Section 3553(a)(4), the Court must determine and consider the sentencing range established by the United States Sentencing Guidelines ("Guidelines" or "U.S.S.G."). The parties agreed to the following advisory sentencing guideline factors. Pursuant to U.S.S.G. § 2X2.1, the base offense level for aiding and abetting is the same as the underlying offense; the base offense level for an 18 U.S.C. § 1366(a) violation is **6**. U.S.S.G. § 2B1.1. Here, the level is increased to **14** because the offense involved possession of a dangerous weapon pursuant to § 2B1.1(b)(16). Because this felony offense involved or was intended to promote a federal crime of terrorism, the offense level is increased to **32** pursuant to § 3A1.4(a). Finally, if Frost continues to comply with the terms of § 3E1.1, there is a **2**-level reduction for acceptance of responsibility and a **1**-level reduction for Frost's timely notification of his intent to plead guilty. This brings Frost's offense level—as contemplated and agreed by the parties—to **29**. Pursuant to § 3A1.4(b), Frost's criminal history category is VI. Together, this corresponds to a guideline range of 151-188 months. The parties

additionally recommend that this Court impose a 30-year term of supervised released to be served after the completion of the term of imprisonment that this Court finds appropriate.

c. Defendant's Objections

There remain three objections by Defendant to the PSR. Frost objects to the Probation Officer's use of the words "destruction" and "destroy" in describing the intent behind Frost's conduct, the 4-level enhancement for being an organizer or leader of a criminal activity involving five or more participants, and the 2-level enhancement for using or attempting to use a person less than 18 years of age to commit the offense.

Turning to the first objection, Frost was charged and pleaded guilty to a Conspiracy to Provide Material Support to Terrorists knowing such support was to be used in preparation for and in carrying out a violation of 18 U.S.C. 1366(a), *destruction* of an energy facility. Because the Probation Officer's use of the terms "destruction" and "destroy" is consistent with the offense conduct language, these terms are appropriate. Frost's recommended revision to describe the intended conduct as "an attack to damage and disrupt an energy facility" does not carry the full weight of the conduct to which Frost pleaded guilty.

As to the second objection, the Government agrees that Frost should not receive a sentencing enhancement for leadership status. This specific enhancement was not contemplated by the parties' Plea Agreement. While U.S.S.G. § 3B1.1 cmt. 4 acknowledges that there may be more than one leader in a conspiracy, this is not dispositive as to Frost's role. Here, the commentary's factors do not point to Frost's leadership status.[1] Frost, Cook, and Sawall acted as

---

[1] "In determining whether a defendant was an organizer or leader, courts consider the following factors: 'the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity,

8

co-equals. The trio shared decision-making authority, and none enjoyed a larger share of the fruits of the conspiracy.

As to the third objection, while this enhancement is accurately applied because Frost attempted to recruit minors for the conspiracy, the government will honor its agreement to recommend the Sentencing Guidelines enumerated within the Plea Agreement; and this enhancement is not included in the agreement.

## IV. Proper Sentence

After properly calculating the guideline range, the Court must next consider all the sentencing considerations set forth in Section 3553(a). Those factors include:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant;
> (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner;
> (5) the guidelines and policy statements issued by the Sentencing Commission;
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
> (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

***The Nature and Circumstances of the Offense.*** As set forth above, the nature and circumstances of this offense are hateful, dangerous, and contemplated an attack resulting in enormous economic costs and the death and destruction of our entire way of life by replacing the

---

and the degree of control and authority exercised over others.'" *United States v. Griffin*, 829 F. App'x 108, 109 (6th Cir. 2020) (quoting U.S.S.G. § 3B1.4, cmt. n.4).

leaders of our Republic with white supremacists. Conspiring to synchronously attack the United States power grid nationwide is a serious and destructive offense, the gravity of which is heightened by the underlying motivation: Frost and his coconspirators were fueled by white supremacy ideology. As evidenced by the group's chats, the extremist material discovered in Frost's residence, and the reading list assigned to new recruits, white supremacist ideology formed the cornerstone of the conspiracy. In the minds of Frost and his coconspirators, this racially motivated end justified the means. The national power grid was targeted precisely for the damage that they hoped to inflict—both in terms of economics and life. The group fantasized about the attacks triggering a race war, a depression, and the opportunity for white leaders to take control of this country and its government. Notably, Frost and his coconspirators acknowledged that causing a widespread power outage would result in the deaths of Americans, yet this did not deter them.

The calculated material steps that Frost and his coconspirators made towards the power grid attacks underscore the crime's seriousness. Rather than a destructive idea in its infancy, the coconspirators made concerted progress to effectuate their goal. Defendants researched and discussed their plan of attack, and Frost played a particularly important role in the preparations and logistics. Frost obtained and then sought to provide several AR-47 rifles for coconspirators to carry out the attacks. After extensive research, Frost concluded that heavy caliber firearms would be necessary to penetrate the transformers. In February 2020, Frost sold one of these firearms to Cook and subsequently trained him at a shooting range. But Frost's preparations did not stop there. A search of Frost's residence uncovered chemicals and components capable of building explosives along with explosives production diagrams and manuals. The coconspirators' experimentation with explosives and possession of assault rifles exponentially increases the dangerousness of the offense.

The coconspirators' dedication to the planned attacks further adds to the severity of the offense. Frost acquired and then provided fentanyl suicide necklaces in furtherance of the conspiracy. Sawall swallowed his suicide pill during a traffic stop, though he ultimately survived. In light of these facts, the Court must consider "the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A). Because Frost committed a serious terrorism offense for malicious reasons,[2] anything less than a correspondingly serious term of imprisonment would spurn respect for the law at the expense of justice.

***The History and Characteristics of the Defendant.*** Frost benefitted from a generally supportive and well-rounded childhood. He recalled that his family provided ample support, guidance, discipline, and encouragement. While Frost was not raised or surrounded by white supremacist ideology during his childhood, he chose to pursue a path of white supremacist ideology that ultimately led to his actions in this case. As someone who struggled to form social connections in person, Frost turned to online connections with those who shared his white supremacist beliefs.

The Government commends Frost's openness to counseling, which he has found beneficial, but the Government also submits that a transition will not take place overnight, or even in two years. As such, the Government tailored its recommended sentence to ensure that Frost receives the support he needs during his progression. The Government submits that its recommended 100 months of imprisonment, followed by 30 years of supervised release, appropriately allows Frost

---

[2] *See United States v. Meskini*, 319 F.3d 88, 92 (2d Cir. 2003) ("Congress and the Sentencing Commission had a rational basis for concluding that an act of terrorism represents a particularly grave threat…, and thus that terrorists and their supporters should be incapacitated for a longer period of time."); *United States v. Mumuni*, 946 F.3d 97, 112-13 (2d Cir. 2019) (quoting *Meskini*, 319 F.3d at 92) ("Terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal.").

to make his first steps in that process without unduly ignoring the other Section 3553(a) factors. The terms of release were specifically tailored with Frost's mental health in mind. The parties agreed to terms of mental health treatment as well as violent extremism counseling. Thus, the sentence comports with Section 3553(a)(2)(D) by providing Frost with the needed medical care and correctional treatment.

Frost joined the conspiracy at age 22, in his last year of college. Frost is before the Court for an unusually serious offense[3]—the gravity of Frost's offense overshadows any conceivable mitigating circumstances.[4] Nevertheless, the Government submits that its proposed sentence appropriately accounts for mitigating circumstances (including the lack of social connections with his peers) and the nature of the terrorism offense.[5]

***The Need to Afford Adequate Deterrence to Criminal Conduct.*** Deterrence to criminal conduct must be considered as this Court imposes its sentence. 18 U.S.C. § 3553(a)(2)(B). Here, both general and specific deterrence counsel towards the Government's suggested incarceration term of 100 months. Frost encountered law enforcement several times while he acted in furtherance of the conspiracy. In February 2020, the trio was stopped by police during a traffic stop; Sawall swallowed his suicide pill and survived. This did not deter Frost. On March 15, 2020, Frost and

---

[3] Terrorism offenses are uniquely serious. *See, e.g., United State v. Tounisi*, 900 F.3d 982, 987 (7th Cir. 2018) (affirming 180-month sentence for 18-year-old after sentencing judge concluded that the terrorism offense was "gravely serious" despite defendant's age); George D. Brown, *Punishing Terrorists: Congress, the Sentencing Commission, the Guidelines, and the Courts*, 23 CORNELL J.L. & PUB. POL'Y 517, 546 (2014) ("Terrorism is different from other crimes. Terrorist acts can intimidate a civilian population and disrupt entire communities…. The [terrorism] enhancement represents a major national policy goal.").

[4] District courts enjoy discretion to "emphasize the nature of the crime over the mitigating factors." *United States v. Zapata*, 589 F.3d 475, 488 (1st Cir. 2009).

[5] As one district court noted, a person's reasons for being more susceptible to joining a terrorist group, "whether it be family background, social alienation, school difficulties, or even the lack of any worthy ambition," may "explain, [but] do not excuse, the decision to join a terrorist organization." *United States v. Bell*, 81 F.Supp.3d 1301, 1324 (M.D. Fla. 2015).

Cook were stopped during a traffic stop in Texas and a search exposed concerning evidence. Again, this did not deter Frost.

Only after observing a third interaction between Cook, a juvenile recruit, and law enforcement did Frost cease his association with Cook and the conspiracy. He did not, however, tell his family, law enforcement, or others about the destructive conspiracy underway and his coconspirators' efforts to recruit juveniles. And Frost did not rid himself of the white supremacy ideology and tools that fueled his intentions and motivations—as evidenced by the results of the August 2020 search of Frost's residence. The search uncovered multiple firearms, suppressors, milling tools, chemicals and components capable of building explosives, racially motivated violent extremism Nazi material, information concerning the U.S. power infrastructure, and explosives production manuals.

According to the PSR, "Frost explained that he now rejects the views he held during the conspiracy." (PSR ¶ 40). Taking Frost at his word, the Government acknowledges that it likely will be a long road of recovery and rehabilitation. Frost's parents shared the sentiment that Frost had "never given indication that he held such beliefs." (PSR ¶¶ 71, 74). Yet, according to Frost, he first became interested in white supremacy ideation in high school. The process of rejecting a past lifestyle filled with white supremacy ideology is not instantaneous, so specific deterrence is still necessary.

Moreover, even if the Court accounts for Frost's remorsefulness, general deterrence warrants a significant sentence of incarceration. Domestic terrorism is on the rise.[6] Others thinking about conspiring to commit acts of terrorism—especially for racially-motivated ends—must

---

[6] Robert O'Harrow Jr., et. al., *The Rise of Domestic Extremism in America*, WASHINGTON POST (April 12, 2021), https://www.washingtonpost.com/investigations/interactive/2021/domestic-terrorism-data/.

13

receive an unequivocal message: such behavior will not be tolerated by the United States criminal justice system. *See United States v. Tounisi*, 900 F.3d 982, 987 (7th Cir. 2018) (noting approvingly of the district court judge stating that "'a great need for general deterrence' existed because people must know that they will be punished for 'assisting terrorist organizations'"); *United States v. Doe*, 323 F.Supp.3d 368, 390 (E.D. N.Y 2018) ("General and specific deterrence play a large part in the court's considerations, particularly given the increasingly common nature of terrorism-related crimes.").

***The Need to Protect the Public from Further Crimes of the Defendant.*** In fashioning its sentence, the Court must consider the need to protect the public from Frost's further crimes. 18 U.S.C. § 3553(a)(2)(C). Considering that Frost conspired to attack the national power grid and procured assault rifles and materials for building explosives to carry out this aim, he presents a threat to the public. Not only would execution of the coconspirators' plan have disrupted critical infrastructure and the daily activities of Americans, as well as potentially having severe economic consequences for the country, but—as Defendants themselves realized—it likely would have resulted in deaths. Even more fundamentally, Frost conspired to attack the power grid precisely *because* of the destruction and anarchy that he believed would result from the attack. By intending to destabilize society in hopes of a white supremacist agenda, Frost conspired to strike at something more existentially integral to this country than electric transformers: the bonds between citizens and the rule of law itself.

Frost's pattern of undeterred perseverance towards the conspiracy's goal, as described above, further underscores that a substantial term of imprisonment is necessary to protect the public. In furtherance of the conspiracy, Frost sold an AR-47 ghost gun (without a serial number) to Cook and taught Cook how to use it. Frost also tested one of his homemade explosives while in

14

Texas. Therefore, despite Frost's expression of remorsefulness, he was still willing to harm others and he remains a threat to the public.[7]

***The Need to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct.*** The term of imprisonment recommended by the Government prevents unwarranted sentence disparities pursuant to 18 U.S.C. § 3553(a)(6). While a perfect comparator case does not exist for Frost's precise situation and offense, several cases provide useful insight. From a broader perspective, a common thread runs through terrorism sentencing nationwide: heavy terms of incarceration are the general rule rather than the exception. This rings true for the charge at issue in this case—conspiracy to provide material support to terrorists. *See, e.g., United States v. Bell*, 81 F. Supp. 3d 1301, 1321 (M.D. Fla. 2015) (Between 2009 to 2013, there were twelve cases where the only count was § 2339A. "[T]he average sentence was 116 months, and the median sentence was 114 months.").

The following comparable cases elucidate that the Government's recommended sentence for Frost falls within the vicinity of sentences for similar terrorist conduct in other cases. First, consider a case close to home. Three defendants—two of whom were 20 years of age—were sentenced to 138 months, 117 months, and 97 months for conspiring to use explosives to destroy the Brecksville-Northfield High Level Bridge in the Northern District of Ohio.[8] After purchasing inert C-4 explosives from an undercover FBI agent, the defendants placed the explosives on the

---

[7] *See United States v. Bell*, 81 F. Supp. 3d 1301, 1325 (M.D. Fla. 2015) ("However, unlike other crimes, where, in a close case, the Court might give the benefit of the doubt to a seemingly remorseful defendant, terrorism-related crimes are different. Terrorism endangers the lives and property of the public at large, seeks to weaken or destroy societal institutions, and tries to spread as much fear and panic as possible. While the Court hopes that [defendant]'s disavowal of this path is real, the need to protect the public from further crimes of this defendant remains an important consideration.").

[8] *Three Men Sentenced to Prison for Roles in Plot to Bomb Ohio Bridge*, Federal Bureau of Investigation (Nov. 20, 2012), https://archives.fbi.gov/archives/cleveland/press-releases/2012/three-men-sentenced-to-prison-for-roles-in-plot-to-bomb-ohio-bridge.

base of the bridge and attempted to detonate the devices. *United States v. Wright*, 2012 WL 5507254, at *7 (N.D. Ohio Nov. 14, 2012), *aff'd,* 747 F.3d 399 (6th Cir. 2014). Like Frost, these young defendants acknowledged that their plan to evoke fear and sow division likely would kill people, yet they remained undeterred. *Id.* at *6. Similarly, another defendant was recently sentenced to 96 months of incarceration for conspiring to damage an energy facility. *United States v. Reznicek*, 2022 WL 1939865, at *1 (8th Cir. June 6, 2022) (affirming 96-month term of imprisonment for defendant who committed arson and vandalism to cut holes in the Dakota Access Pipeline to save the environment and preserve human life as opposed to the purpose of the instant conspiracy that wanted to upend life and cause death).

The fact that Frost and his coconspirators did not succeed in their plans does not eliminate the need for a heavy term of imprisonment. Take, for example, the case of Shelton Bell; at 19 years old, he became fascinated by Anwar al-Awlaki and jihadism. *United States v. Bell*, 81 F.Supp.3d 1301, 1304 (M.D. Fla. 2015). Bell eventually traveled to the Middle East, but he was captured and brought back to the United States before killing or injuring anybody. *Id.* Bell pleaded guilty to one count of conspiring to provide material support to terrorists and one count of attempting to provide material support to terrorists. *Id.* at 1305. Even though Bell's intended violent plans never came to fruition, the court explained that the inchoate nature of the crimes was built into the guidelines sentence. *Id.* at 1317. The sentencing court further noted that Bell (like Frost) was "very young," that he "could be counseled in prison" and that his post-release activities can be "closely monitor[ed]" during a lifetime period of supervised release. *Id.* at 1325. Bell was sentenced to a term of incarceration of 240 months. *Id.*

That Frost and his coconspirators were motivated by white supremacist ideology rather than jihadist sentiment or another motivation does not remove this case from the heartland of

16

terrorism cases. After all, as previously described, the conspiracy at bar squarely evokes "the serious dangers posed by *all* forms of terrorism." *United States v. Meskini*, 319 F.3d 88, 92 (2d Cir. 2003) (emphasis added). Ultimately, Frost and his coconspirators intended to use the same playbook as any other terrorist: "to instill fear and to strike at basic societal institutions." *Bell*, 81 F.Supp.3d at 1324 (unlike Bell, Frost and his coconspirators approved of killing Americans in the homeland).

In sum, the overwhelming national consensus is that terrorism cases are serious offenses that warrant heavy sentences of incarceration.[9] After accounting for Frost's history and characteristics, which are not particularly mitigating, there is no justifiable reason to vary from the consensus that other courts have followed in the context of sentencing for similar terrorism-related cases. After all, this consensus is built upon the mutual recognition by Congress, the Sentencing Commission, and the public that terrorism offenses are serious and must be punished accordingly.

**Forfeiture.** While there is no restitution owed in this case, the United States respectfully requests that the Court order the forfeiture of the items outline in the Forfeiture Allegation contained in the Information and Plea Agreement.

---

[9] Again, this is true even though Frost's conduct did not result in death or physical injury. *See Mumuni*, 946 F.3d 97, 113 ("Moreover, when it comes to sentencing terrorism, Congress and the United States Sentencing Commission 'plainly intended for the punishment of crimes of terrorism to be significantly enhanced without regard as to whether…the defendant's conduct failed to achieve its intended deadly consequences.' Thus, in determining what constitutes a 'sufficient' sentence for a terrorist defendant whose conduct did not result in death or physical injury, a sentence at the high end of the applicable range may plainly be reasonable if supported by the balance of the § 3553(a) factors."

V.    **Conclusion**

For the reasons set forth above, the United States respectfully recommends that Defendant Jonathan Allen Frost be sentenced to a term of imprisonment of 100 months followed by thirty years of supervised release. The Government submits that this sentence is sufficient but not greater than necessary to satisfy the statutory purposes set forth in 18 U.S.C. § 3553(a).

KENNETH L. PARKER
United States Attorney

*s/Jessica W. Knight*
JESSICA W. KNIGHT (0086615)
Assistant United States Attorney
JUSTIN SHER (DC974235)
Trial Attorney
303 Marconi Boulevard, Suite 200
Columbus, Ohio 43215
Phone: (614) 469-5715
Email: Jessica.knight@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing *Government's Sentencing Memorandum* was electronically served via the Court's CM/ECF system this 28th day of October, 2022 upon Counsel for Jonathan Allen Frost.

*s/Jessica W. Knight*
JESSICA W. KNIGHT (0086615)
Assistant United States Attorney
